

Entered on Docket
May 25, 2010
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

Signed: May 24, 2010

EDWARD D. JELLEN
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re

CAROLINA CONTRERAS RYNDA,

                 Debtor.   /

TEVIS T. THOMPSON, JR.,
Trustee of the Bankruptcy
Estate of Carolina Contreras
Rynda,

                 Plaintiff,

vs.

JOHN J. RYNDA,

                 Defendant. /

Case No. 09-41568 EDJ 7
Adv. No. 09-4487 AJ

## DECISION

    This is an action for breach of contract. The plaintiff is Tevis T. Thompson, Jr., trustee in bankruptcy ("Thompson"). The defendant is John J. Rynda, who entered into a contract with Thompson to purchase certain property of the bankruptcy estate. (Because there are three persons involved in this case with the last name, "Rynda," the court will hereafter refer to the defendant as "Jay"). The court will enter judgment in favor of Thompson.

DECISION

A.  Background

Prior to the filing of the petition herein, Carolina Contreras Rynda, the above debtor ("Carolina"), was the owner of 50% of the stock in Rynda's No. 1 Insurance Services, Inc. (the "Stock"). The remaining 50% of the Stock was owned by Carolina's ex-husband, David Rynda ("David"). David is also Jay's brother.

On February 27, 2009, Carolina filed her petition herein under chapter 7 of the bankruptcy code, whereupon her interest in the Stock became property of her bankruptcy estate pursuant to Bankruptcy Code § 541(a). As trustee in bankruptcy, Thompson sought to sell the Stock.

Carolina wished to re-acquire the Stock, and formed a group with two other persons to purchase it at an auction Thompson had scheduled. David also wished to acquire the Stock, but did not want ownership in his name because he feared that the state court that was hearing his divorce case against Carolina might exercise jurisdiction over the Stock in a manner detrimental to his financial interest. He therefore persuaded Jay to purchase the Stock under an arrangement whereby Jay would transfer the Stock to David at a later date.

The auction, held September 17, 2009, was spirited. Carolina's highest bid was $95,000. Jay, however, was the high bidder with a bid of $100,000. Following the auction, Jay and Thompson entered into an Agreement of Purchase and Sale dated September 18, 2009 (the "Agreement") whereunder Thompson agreed to sell and Jay agreed to purchase the Stock for a price of $100,000. (Jay had previously put

DECISION                          2

down a deposit in the sum of $2,250; thus, $97,750 remained owing under the Agreement.) By order entered September 28, 2009, this court approved the sale pursuant to the Agreement.

Jay did not perform. Thompson attempted, again, to sell the Stock, but the best he could do was to sell the Stock to David for $26,000. This adversary proceeding for breach of contract damages followed.

B. <u>Discussion</u>

Jay's defenses to liability consist of 19 affirmative defenses, a variety of novel legal theories unsupported by any recognized statutory or case law, and several additional theories that, although recognized, have no relevance to the facts present here.

1. <u>The Affirmative Defenses</u>. Prior to trial, Thompson filed a motion <u>in</u> <u>limine</u> seeking to exclude evidence regarding the 19 affirmative defenses on various grounds. One ground was that Jay had failed to comply with an order this court entered April 29, 2010, requiring him to answer certain interrogatories that sought to elicit facts regarding the 19 affirmative defenses. The "responses" Jay filed as to each of the 19 interrogatories at issue, which appear on pleading paper bearing the name of, and which were apparently drafted by, Jay's counsel herein, Duane Tucker, stated:

> As a lay person I do not know what a affirmative defense is. My attorney explained to me that certain defenses had to be raised at the time of your answer or they were waived and despite the truth of the allegations in the complaint that the plaintiff would not be entitled to relief.
>
> I believe the defense speaks for it's self and through discovery, that is if plaintiff ever produces it's

DECISION 3

```
     document the affirmative defense may be proved at trial.
     See the documents that I have produced.
```

This unethical and inexcusable tactic was not only a violation of the court's order, but was clearly designed, without just cause or excuse, to avoid disclosure and to harass and delay Thompson by multiplying and increasing the cost of these proceedings. The court granted the motion <u>in</u> <u>limine</u>. <u>See</u> Fed. R. Bankr. P. 37(b)(2), applicable via Fed. R. Bankr. P. 7037.[1]

    2.  <u>The Unrecognized Defenses</u>. Jay argued at or before trial that he should not be liable to Thompson because: (1) at the auction, Thompson should have stopped the bidding when Jay bid more than $40,000, for the reason that Jay had not provided Thompson with evidence that he could pay Thompson a purchase price exceeding $40,000; (2) the Agreement is not binding by its terms in that it recited that Jay had made the $2,250 deposit "upon execution of this Agreement," whereas Jay had actually tendered the deposit prior to execution of the Agreement; and (3) David had obtained a restraining order against Carolina in the state court divorce case, but Thompson allowed Carolina to be in the room with David during the auction.

    Each of these defenses is an absolute absurdity, and each is, of course, rejected.

/////

---

[1] Jay's failure to provide discovery and to comply with the court's discovery order, in itself, justifies the granting of the motion <u>in</u> <u>limine</u>. Therefore, the court need not address the remaining grounds for the motion alleged by Thompson.

DECISION    4

3. <u>The Remaining Defenses</u>.

   a. <u>Prepetition Fraud by Carolina</u>.

One of Jay's defenses was based on some alleged fraudulent activity by Carolina, apparently directed against David, prior to the filing of the petition herein. At trial, Jay sought to call two witnesses to testify about the alleged fraud by Carolina. The court did not allow the testimony for two reasons. First, any such prepetition fraud by Carolina is irrelevant.

Second, the terms of the Agreement preclude any such defense. Specifically, the Agreement contains a clause stating that the Stock is sold "as is, where is and the Trustee makes no representations or warranties, express or implied." Moreover, the Agreement contains an integration clause stating:

> This Agreement constitutes the entire agreement of the parties and supercedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties.

Finally, the Agreement contains another clause whereby Jay warranted and represented as follows:

> The Buyer has been furnished with, and has had access to, such information as he or she considers necessary or appropriate for deciding whether to invest in the Stock, and the Buyer has had an opportunity to ask questions and receive answers from Seller and Rynda's No. 1 regarding the terms and conditions of the transfer of the Stock.

Thus, regardless of whatever Carolina did or did not do to David or Rynda's No. 1 Insurance Services, Inc. before she filed her bankruptcy petition herein, such is not a valid defense to Thompson's breach of contract claim against Jay.

DECISION 5

b. <u>Illegal Bidding by Carolina</u>

Jay contends that, at the auction, Carolina submitted bids without the intention of purchasing the Stock, or the ability to do so, and that she did so solely to artificially inflate the price that he, Jay, would have to pay to acquire the stock. The evidence, however, showed that this allegation is factually groundless.

Jay bases this contention solely on the fact that Carolina declined to commit to be a back-up bidder after Jay won the auction, and declined to buy the Stock after Jay defaulted. This, however, does not establish that Carolina was not bidding in good faith.

Prior to the auction, Thompson requested financial information from potential bidders to pre-qualify them as bidders. Carolina's group submitted the required information, and qualified. There is no evidence that the information Carolina submitted to Thompson was inaccurate. Carolina testified, persuasively, that her group was prepared and able to pay Thompson $95,000 if the group's bid had been the high bid.

For the foregoing reasons, this defense fails.

c. <u>No "Meeting of the Minds" and Mistake of Law by Jay</u>.

Jay contends that the Agreement was not a valid contract because he and Thompson never had a "meeting of the minds" regarding its terms. In support, Jay testified that he was under the impression that under the contract, he had the option to "walk away" without performing, and that the only adverse consequence of doing so would be forfeiture of his $2,250 deposit. In support, Jay cites <u>Elyaoudayan v. Hoffman</u>, 104 Cal. App. 4th 1421, 129 Cal. Rptr. 2d 41

DECISION 6

(2003) and <u>Banner Entertainment, Inc. v. Superior Court</u>, 62 Cal. App. 4th, 72 Cal. Rptr. 2d 598 (1998).

Both these cases are of no relevance here. Rather, they addressed the issue of when an oral agreement is binding under circumstances where the parties had contemplated execution of a written agreement. In both cases, the court held that if the parties intended to be bound by their oral agreement, then they were indeed bound, even if one party refused to sign a written agreement.

Thus, the cases cited by Jay have nothing to do with the facts of this case.

Moreover, although it is true as an abstract legal proposition that a "meeting of the minds" is essential to formation of a valid contract, it is equally true that the objective theory of contracts is the proper standard in California. As one court stated:

> California recognizes the objective theory of contracts under which '[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation.' The parties' undisclosed intent or understanding is irrelevant to contract interpretation.

<u>Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.</u>, 109 Cal. App. 4th 944, 956, 135 Cal. Rptr. 2d 505, 514 (2003) (internal citations omitted). <u>See</u> also <u>Brant v. California Dairies, Inc.</u>, 4 Cal.2d 128, 133 (1935) ("the outward manifestation or expression of assent is controlling"); <u>Edwards v. ComStock Ins. Co.</u>, 205 Cal. App. 3d, 1169, 252 Cal. Rptr. 807 ("The general rule is that when a person with the capacity of reading and understanding an instrument signs it, he is, in the absence of fraud

DECISION 7

and imposition, bound by its contents, and is estopped from saying that its provisions are contrary to his intentions or understanding (internal citation omitted))."

Along the same lines, the court in <u>Crow v. P.E.G. Construction Co., Inc.</u>, 156 Cal.App.2d 271, 278-279, 319 P.2d 47 (1957) stated as follows (quoting <u>Zurich General Acc. & Liability Assur. Co. v. Industrial Acc. Commission</u>, 132 Cal.App. 101, 22 P.2d 572 (1933)):

> [T]he law imputes to a person an intention corresponding to the reasonable meaning of his words and acts. It judges of his intention by his outward expressions and excludes all questions in regard to his unexpressed intention. If his words or acts, judged by a reasonable standard, manifest an intention to agree in regard to the matter in question, that agreement is established, and it is immaterial what may be the real but unexpressed state of his mind on that subject.

Thus, under the objective theory of contracts, even if Jay actually believed that he had agreed to something other than what the Agreement stated, or had misunderstood the legal consequences of a breach, such belief or misunderstanding is simply irrelevant.

Jay testified that Michael McQuaid, Thompson's counsel herein, had told him during the auction, in response to an inquiry, that the only consequence of a breach would be forfeiture of his deposit. McQuaid testified to the contrary. Raymond Miller, Carolina's counsel in the main bankruptcy case, testified that he was present when Jay asked McQuaid about the consequences of a breach, and that McQuaid responded to Jay's inquiry by telling Jay that Jay would forfeit his deposit, face liability for breach of contract, and that "'we would be suing you.'"

/////

DECISION                          8

The court rejects the allegation that McQuaid told Jay that he could walk away from the Agreement without liability for breach. But even if the court were to find, contrary to the weight of the evidence, that McQuaid did so, the result here would be no different. Jay signed the Agreement after the conclusion of the auction.[2] As mentioned above, the Agreement, by its terms, is an integrated document that was intended by the parties as a final expression of their agreement. Thus, it may not be altered to include a waiver of any breach of contract damages as a consequence of any statements McQuaid may have made prior to its execution. See Cal. Civ. P. Code § 1856;[3] Founding Members, 109 Cal. App. 4th at 953, 135 Cal. Rptr. 2d at 512.

As a related matter, Jay contends that he may rescind the Agreement. This argument fails for two reasons. First, Jay did not plead any claim for rescission. Second, Jay has no grounds for

---

[2]The court also notes that Jay had access to the same form of agreement (varying only by dates and amounts) at least three months prior to the auction, when, on June 12, 2009, his brother David signed such an agreement on his behalf. Because of the auction, this earlier agreement was superceded by the Agreement, which Jay personally signed following the auction.

[3]Cal. Civ. Proc. Code § 1856 codifies the "parol evidence rule." Subsection (a) of § 1856 provides: "Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement."

DECISION                                                9

rescission . See Cal. Civ. Code § 1689.[4]

The court holds that none of the other defenses asserted by Jay are valid under the facts of this case.

4. Damages

The measure of damages for breach of contract is governed by Cal. Civ. Code §§ 3300 and 3302. Section 3300 states, in relevant part, that the measure of damages for breach of contract is the "amount which will compensate the party aggrieved for all the detriment proximately caused thereby or which, in the ordinary course of things, would be likely to result therefrom." Section 3302 provides: "The detriment caused by the breach of an obligation to pay money only, is deemed to be the amount due by the terms of the obligation, with interest thereon."

Here, the contract amount totaled $100,000, from which must be subtracted Jay's deposit in the sum of $2,250 and the proceeds in the sum of $26,000 that Thompson eventually recovered on sale of the Stock, leaving a liability in the sum of $71,750, plus interest. The Agreement contains an attorneys' fees clause. Thus Thompson, as the prevailing party, is entitled to his attorneys' fees for prosecution of this adversary proceeding.[5] The amount of such fees

---

[4] Cal. Civ. Code § 1689(b) sets forth seven grounds for rescission of a contract. Apart from the fact that Jay alleged no claim for rescission in the pleadings, none of such grounds is applicable to the facts present here.

[5] The court notes from Thompson's trial brief herein that he requests an award of attorneys' fees, not only for prosecution of
(continued...)

DECISION 10

will be set upon the filing of an appropriate motion. See Local District Court Rule 54-5. The amount of costs will be determined in accordance with the provisions of Local District Court Rule 54-1 to 54-4.

C. Conclusion

The court will issue its judgment in favor of Thompson in the sum of $71,750, plus interest.[6] Thompson will also be entitled to an award of attorneys' fees and costs in accordance with the procedures mentioned above.

**END OF ORDER**

---

[5](...continued) this adversary proceeding, but also for the sale of the Stock after Jay defaulted. Such fees do not come within the ambit of the attorneys' fees clause in the Agreement. Accordingly, Thompson should brief the issue of his entitlement to such fees if he wishes the court to consider awarding them.

[6] The court requests Thompson to prepare a proposed form of judgment, calculating the appropriate amount of interest based on California law, and measuring the accrual on the sum of $97,750 from October 8, 2009, the date that payment of that amount was due, through the date on which Thompson received the $26,000 payment, and accrual thereafter on the sum of $71,750 through the date of the judgment. Alternatively, to simplify matters, Thompson may limit interest to the amount that accrued on $71,750 from October 8, 2009 to the date of judgment. In either case, the total as so computed will bear post-judgment interest at the federal legal rate.

DECISION 11

COURT SERVICE LIST

Michael J. McQuaid, Esq.
Carr, McClellan, Ingersoll,
    Thompson & Horn
P.O. Box 513
Burlingame, CA 94011-0513

Duane L. Tucker, Esq.
Law Offices 27793 Tampa Avenue
Hayward, CA 94544

Raymond R. Miller, Esq.
Law Offices
P.O. Box 2177
Castro Valley, CA 94546

DECISION 12